## AFFIDAVIT IN SUPPORT OF A
## SEARCH WARRANT APPLICATION UNDER RULE 41

I, Bradley Baker, being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the contents of an electronic device capable of accessing the internet (the Target Phone, defined below and described in Attachment A), and the extraction from the Target Phone of electronically stored information further described in Attachment B. Because this affidavit is submitted for the limited purpose of securing a warrant to search the Target Phone, I have set forth only the facts which I believe are necessary to establish probable cause to search the Target Phone.

2. I am a Special Agent (SA) with Homeland Security Investigations (HSI) and assigned to HSI Assistant Special Agent in Charge (ASAC) Nogales, Arizona.  As such, I am an investigative law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and empowered by law to conduct investigations and make arrests for offenses enumerated in Title 18, United States Code, Section 2516.  I have been a Special Agent with HSI since July 2018.  As a Special Agent, I am responsible for investigating laws enumerated in Title 8, Title 18, and Title 21 of the United States Code.  Included in my responsibilities is the investigation of illicit contra-band smuggling, including controlled substance smuggling, across the United States border.  In preparing to become a Special Agent, I attended the Criminal Investigator Training Program and the HSI Special Agent Academy at the Federal Law Enforcement Training Center in Glynco, Georgia. I have a Bachelor of Science degree in Criminal Justice from Appalachian State University.

3. Prior to joining HSI, I was a Special Agent with North Carolina State Bureau of Investigation Alcohol Law Enforcement Branch for more than eight years in Asheville, North Carolina. During that time, I conducted numerous criminal investigations involving violations of criminal laws resulting in arrests. During these investigations I applied for and executed numerous search warrants that resulted in successful prosecutions. I was also a Federal Task Force Officer with HSI for two years. During that time, I became familiar and assisted with the enforcement of federal laws.

4. Through my training and experience, including on-the-job discussions with other law enforcement agents and cooperating suspects, I am familiar with the operational techniques and organizational structure of drug smugglers and drug trafficking distribution networks. My responsibilities include conducting investigations into drug smuggling organizations and individuals who derive substantial income form the illegal importation, manufacture, distribution, and sale of illegal controlled substances. As a Special Agent with HSI, I am responsible for investigating and enforcing violations of federal law to include the enforcement of federal drug laws, money laundering laws, and various customs and immigration laws.

5. Through training and experience I know:

    a. That large-scale drug traffickers often utilize electronic equipment such as cellular telephones, personal digital assistants (PDAs), computers, telex machines, facsimile machines, and telephone answering machines to generate, transfer, count, record, and/or store information related to the transportation, ordering, selling, and distribution of controlled substances;

    b. That drug traffickers commonly use cellular telephones to communicate with their narcotics associates and to facilitate the commission of their narcotics offenses. These cellular telephones usually contain electronically stored data on or within the cellular telephones, including, but not limited to, contact names and numbers of narcotics associates, call details including call history, electronic mail (email) messages, text messages and/or text message history, and digital images of the drug-trafficking associates and/or activity, all of which can be used to identify and locate narcotics-trafficking associates, to identify methods of operation of the drug-trafficking organization (DTO), and to corroborate other evidence obtained during the course of the current investigation;

    c. That drug traffickers commonly maintain addresses or telephone numbers in books, papers, cellular telephones, and PDAs which reflect names, addresses, and/or telephone numbers of their associates in the smuggling organization;

    d. That drug traffickers commonly utilize electronic paging devices, cellular telephones, radio telephones, and telephone scrambling devices in attempts to maintain secure communications between drug suppliers and customers; and

e. That drug traffickers take, or cause to be taken, photographs and videos of themselves, their associates, their property, and their drugs. That these drug dealers usually maintain these photographs within their possession and in their cellular telephones.

f. That drug traffickers retain records pertaining to financial transactions and the persons for whom the transactions are being conducted.

g. That drug traffickers collect data pertaining to other co-conspirators involved in drug-trafficking activity, including drug types and quantities provided, as well as monies owed and/or paid for illegal controlled substances;

h. That drug traffickers possess and maintain records reflecting bank transactions and/or money transfers.

## IDENTIFICATION OF THE PROPERTY TO BE EXAMINED

6. The property to be searched is a black Apple iPhone, with IMEI: 353059108708271 (Target Phone).

7. The Target Phone is currently in storage and secured in the evidence vault, located at the HSI Nogales Office in Nogales, Arizona. The applied-for warrant would authorize the forensic examination of the Target Phone for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

8. On August 28, 2022, at approximately 2:57 p.m., United States (U.S.) Customs and Border Protection Officer (CBPO) Jose Montano was working primary vehicle inspection lane four at the Mariposa Port of Entry in Nogales, Arizona. CBPO Montano encountered a red 2008 Infiniti G35 four-door passenger car bearing Arizona registration plate of Y9A4CPA. The Infiniti was driven by Francisco Javier ARREGUIN-Rabago (DOB: 06/26/2000), a U.S. Citizen, who presented himself for entry into the U.S. from the Republic of Mexico. ARREGUIN was the sole occupant of the vehicle.

9. ARREGUIN informed CBPO Montano that he lives in Mesa, Arizona and was in Mexico visiting a friend that had been recently deported. ARREGUIN said he spent the weekend in Mexico partying with this friend. ARREGUIN told CBPO Montano the Infiniti belonged to him, and he had purchased it approximately two weeks prior from someone on Facebook Marketplace in the Mesa

area.  ARREGUIN stated he had not registered the vehicle in his name because he was unable to register any vehicle in Arizona because of an abandoned vehicle in his name.

10. CBPO Montano inspected the front, back, and trunk area of the vehicle and did not observe any luggage or clothing in the car.  When CBPO Montano asked ARREGUIN why he did not have any luggage, ARREGUIN took a long pause, stumbled over his words, and replied he did not take any and was just wearing his friend's clothes.  ARREGUIN later changed his story and told CBPO Montano he just wore the clothes he currently had on.  CBPO Montano obtained a negative oral binding customs declaration from ARREGUIN to include drugs.  CBPO Montano referred ARREGUIN to secondary inspection.

11. During secondary inspection, ARREGUIN was instructed to drive the Infiniti through the Z-Portal (x-ray) machine.  CBPO Jean Almodovar Jimenez, Z-Portal operator, scanned the vehicle and identified anomalies in the rear quarter panels of the vehicle.  CBPO Rene Ramirez Vega obtained a second negative oral binding customs declaration from ARREGUIN to include drugs.  ARREGUIN advised CBPO Vega he was responsible for everything inside the vehicle.  CBPO Jimenez advised CBPO Vega of the anomalies from the Z-Portal scan and CBPO Vega detained ARREGUIN.

12. CBP Canine Enforcement Officer (CEO) Heredia utilized his assigned narcotic detection canine, Max (181163) to conduct a sniff of the Infiniti.  CBP Canine Max alerted to a trained odor emanating from the trunk area of the vehicle.  Upon further inspection of the vehicle, CBPOs Vega and Jimenez located thirty-four black packages from the rear quarter panels.  The packages were accessed by removing the fabric from the sides of the vehicle within the trunk.  CBPO Courtney Rutkowski took a representative sample from the contents of the packages and conducted a field test.  The sample tested positive for the characteristics of methamphetamine utilizing a Tru-Narc testing device.  The thirty-four packages weighed a total of 15.68 kilograms.

13. At approximately 5:19 p.m., ARREGUIN was administered his Miranda Warnings, he waived his rights, and agreed to speak to me without an attorney present.  ARREGUIN told me he owns the Infiniti and had purchased it approximately three weeks prior from an unknown individual on Facebook Marketplace in the Tucson area for $2,500 in cash.  ARREGUIN said before crossing into the U.S. he took his car to get it vacuumed by an individual at a carwash in Mexico.  ARREGUIN informed me he got his car vacuumed because he smokes marijuana and did not want to cross the border with marijuana crumbs in his car.  ARREGUIN left his vehicle for approximately forty-five

minutes and went to eat. ARREGUIN stated after his car was finished, he was headed home to Mesa, Arizona.

14. ARREGUIN informed me he traveled to Mexico from the U.S. the morning of August 27, 2022, to visit a friend who had been deported approximately a year ago. ARREGUIN said he stayed in a hotel in Nogales, Sonora, Mexico. I showed ARREGUIN the Target Phone and he confirmed it was his. I asked ARREGUIN who "Gris" was because he had received numerous missed WhatsApp calls from that contact. ARREGUIN initially stated he did not know who "Gris" was, but later changed his story and said while he was waiting for his friend to arrive, he stayed at a lady's house, and he knew her as "Gris". ARREGUIN described "Gris" and the individuals at her house as "sketchy" and having numerous tattoos. ARREGUIN told me he felt uncomfortable, so he left and went and stayed in a hotel.

15. ARREGUIN said he believes "Gris" and her husband must have put something in his car while he was at their house. ARREGUIN stated he was at their house for a couple of hours and "Gris" and her husband stayed around his car. ARREGUIN informed me, during this time he was walking around waiting for his friend to arrive.

16. ARREGUIN's phone also was receiving numerous WhatsApp calls from "Sus or Lack." ARREGUIN later admitted the "Sus or Lack" WhatsApp contact that had called his phone numerous times was the friend he was waiting for. ARREGUIN said he went to "Gris" house at the instruction of his friend "Sus or Lack". ARREGUIN told me he grew up and went to school with "Sus or Lack" but did not know his real name.

17. Later, ARREGUIN changed his story and admitted "Gris" offered him $2,000. ARREGUIN stated he was informed that they were going to put a GPS in his car and "Gris" told him he was not going to know anything. ARREGUIN later informed me he was told he was going to transport $10,000 into the U.S. and the GPS was used to make sure he did not steal the money.

18. ARREGUIN again changed his story and told me he was instructed to drive the vehicle back home to the Phoenix area and once he arrived, he was going to be sent an address to go pick up the money from and bring it back to Mexico. ARREGUIN said they made it seem to him that "money sounds way less of a crime than drugs". ARREGUIN informed me once he brought the money back to Mexico, he would then get paid the $2,000.

19. ARREGUIN told me, while at the hotel the night before, he handed his keys to an individual and they took his car at approximately 9:00 p.m. ARREGUIN said the next morning around

9:30 a.m., his car was returned to him. ARREGUIN stated he was told they took his vehicle so a GPS tracker could be installed.

20. ARREGUIN told me he was looking for work to make money and a friend who is currently in jail put him in contact with "Gris" approximately two days prior. ARREGUIN stated he was instructed by "Gris" to download the WhatsApp application on his phone. ARREGUIN said he would receive instructions from "Gris" in the form of voice calls, audio messages, and text messages through WhatsApp. ARREGUIN repeatedly stated he did not know there were drugs inside his vehicle and that he only thought he was going to be bringing money into Mexico from the U.S.

21. I observed ARREGUIN's phone receiving numerous calls. I observed calls from WhatsApp contact "Sus or Lack", WhatsApp contact "Gris", and (480) 336-9425. In my training and experience, cell phones are utilized to coordinate transportation of drugs by drug trafficking organizations. Based on training and experience, I am aware that drug couriers and coordinators routinely communicate via cellular telephone, including through SMS/text messages and messaging applications, prior to and immediately after entering the United States with drug-laden vehicles.

22. Based on the above information, there is probable cause to believe that ARREGUIN was involved in conspiring to import and possess with the intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 846, 841, and 952, and other federal drug statutes, and that evidence related to this offense is located on the Target Phone.

23. The Target Phone is currently in storage and secured in the evidence vault, located at the HSI Nogales Office in Nogales, Arizona. In my training and experience, I know that the Target Phone has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as it was when they first came into the possession of HSI.

**TECHNICAL TERMS**

24. Based on my training and experience, I use the following technical terms to convey the following meanings:

    a. <u>Wireless telephone</u>: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call

log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

  b. <u>Digital camera</u>: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

  c. <u>Portable media player</u>: A portable media player is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

  d. <u>GPS</u>: A GPS navigation device uses the Global Positioning System (GPS) to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can

receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

      e.    <u>PDA</u>: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include GPS technology for determining the location of the device.

      f.    <u>Tablet</u>: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

      g.    <u>Pager</u>: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

      h.    <u>IP Address</u>: An Internet Protocol (IP) address is a unique numeric address used by computers, including cell phones, on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer is assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i.      Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

25.     Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that the Target Phone has capabilities that allows it to serve as a wireless telephone, receive and send email, instant messaging, and a digital camera.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

26.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on electronic devices. This information can sometimes be recovered with forensic tools.

27.     As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Target Phone was used, the purpose of its use, who used it, and when. There is probable cause to believe that the following forensic electronic evidence might be found on the Target Phone:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.      Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.      A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

28. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Target Phone consistent with the warrant. The examination may require authorities to employ techniques that might expose many parts of the Target Phone to human inspection in order to determine whether it is evidence described by the warrant.

29. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise.

## CONCLUSION

30. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Target Phone as described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

BRADLEY D BAKER
Digitally signed by BRADLEY D BAKER
Date: 2022.09.20 11:02:45 -07'00'

Bradley Baker, Special Agent
Homeland Security Investigations

Sworn and subscribed before me telephonically this __20th__ day of September, 2022.

HONORABLE D. THOMAS FERRARO
United States Magistrate Judge

10

## ATTACHMENT A
## PROPERTY TO BE SEARCHED

The property to be searched a black Apple iPhone with IMEI: 353059108708271 (Target Phone), is currently in storage and secured in the evidence vault at the HSI Nogales Office in Nogales, Arizona.

**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEARCHED FOR**

1. Data and/or digital files stored on or accessed through the Target Phone relating to drug trafficking, wherever it may be stored or found, specifically including:
   a. lists of customers and related identifying information;
   b. types, amounts, and prices of drugs trafficked, as well as dates, places, and amounts of specific transactions;
   c. types and amounts of money obtained, received, exchanged, deposited, withdrawn, or delivered, as well as dates, places, exchange rates, and amounts of specific transactions;
   d. any information related to sources of money or narcotic drugs (including names, addresses, phone numbers, or any other identifying information).
2. Electronic correspondence stored on or accessed through the Target Phone relating to drug-trafficking, to include emails and attached files, text messages, and instant messaging logs.
3. Information related to incoming calls, outgoing calls, missed calls, and duration of calls stored on or accessed through the Target Phone.
4. Contact lists stored on or accessed through the Target Phone, to include telephone and email contact names, telephone numbers, addresses, and email addresses.
5. Evidence of persons who used, owned, or controlled the Target Phone.
6. Logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, instant messaging logs, photographs, electronic correspondence, and telephone contact lists stored on or accessed through the Target Phone.